IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

**SIERRA CLUB; WEST VIRGINIA**
**HIGHLANDS CONSERVANCY, INC.; and**
**WEST VIRGINIA RIVERS COALITION, INC.;**

      **Plaintiffs,**

v.        CIVIL ACTION NO. 3:24-cv-00130

**UNITED STATES ENVIRONMENTAL**
**PROTECTION AGENCY; MICHAEL S.**
**REGAN, Administrator, United States**
**Environmental Protection Agency; and**
**ADAM ORTIZ, Regional Administrator,**
**United States Environmental Protection**
**Agency, Region III,**

      **Defendants.**

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1. This action is a sequel to a prior action litigated in the Huntington Division. *See Ohio Valley Environmental Coalition, Inc. v. McCarthy*, Civ. No. 3:15-cv-271, 2017 WL 600102 (S.D. W. Va. Feb. 14, 2017).

2. This citizen suit seeks to compel the United States Environmental Protection Agency, its Administrator, and Regional Administrator for Region III (collectively, "EPA") to perform certain nondiscretionary duties under the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* (the "Clean Water Act").

3. As explained below, EPA has failed to perform nondiscretionary duties under 33 U.S.C. § 1313(d)(2) to establish total maximum daily loads ("TMDLs") for ionic toxicity in certain waters in the Lower Guyandotte River Watershed in West Virginia. Those duties were triggered

1

by (1) the failure by the West Virginia Department of Environmental Protection ("WVDEP") to adhere to certain agreed deadlines for ionic toxicity TMDLs for certain waters in West Virginia's Lower Guyandotte River Watershed in a June 13, 2017 memorandum of agreement between EPA and WVDEP; (2) WVDEP's failure to submit ionic toxicity TMDLs to EPA for certain waters in the Lower Guyandotte River Watershed when WVDEP submitted to EPA other TMDLs for other pollutants causing water quality impairments in that watershed; and (3) WVDEP's failure to submit to EPA pursuant to 33 U.S.C. § 1313(d)(2) any ionic toxicity TMDLs for the Lower Guyandotte River Watershed.

## JURISDICTION AND VENUE

4. This court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) & 33 U.S.C. § 1365(a)(2) (Clean Water Act citizen suit provision).

5. On March 7, 2023, Plaintiffs mailed notice of the alleged violations and their intent to file suit in letters addressed to Defendants Michael S. Regan and Adam Ortiz and to the Attorney General of the United States, as required by Section 505 of the CWA, 33 U.S.C. § 1365(b)(2). More than sixty (60) days have passed since those letters were postmarked.

6. Venue in this District is proper because "a substantial part of the events or omissions giving rise to the claim occurred" in this District. 28 U.S.C. § 1391(e)(1).

7. Venue is appropriate in this District's Huntington Division because this action is related to—and indeed is a sequel to—a prior action litigated to judgment in the Huntington Division. *See Ohio Valley Environmental Coalition, Inc. v. McCarthy*, Civ. No. 3:15-cv-271, 2017 WL 600102 (S.D. W. Va. Feb. 14, 2017).

## PARTIES

8.      Plaintiff Sierra Club is a nonprofit corporation incorporated in California with more than 650,000 members and supporters nationwide and more than 2,000 members who reside in West Virginia and belong to its West Virginia Chapter. The Sierra Club is dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting the responsible use of the Earth's resources and ecosystems; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out those objectives. The Sierra Club's concerns encompass the exploration, enjoyment, and protection of surface waters in West Virginia.

9.      Plaintiff West Virginia Highlands Conservancy, Inc., is a nonprofit organization incorporated in West Virginia. It has approximately 1,700 members. For more than five decades, the West Virginia Highlands Conservancy has been at the forefront of the environmental movement in West Virginia fighting to protect and conserve West Virginia's natural resources for future generations and to ensure a healthy and livable future in the Mountain State.

10.     Plaintiff West Virginia Rivers Coalition, Inc., makes its mission the conservation and restoration of West Virginia's exceptional rivers and streams. It not only seeks preservation of high-quality waters but also the improvement of waters that should be of higher quality. It has approximately 2,500 members.

11.     Plaintiffs' members use streams in the Lower Guyandotte River Watershed that are biologically impaired because of ionic toxicity and suffer cognizable injuries to their aesthetic, recreational, environmental, and/or economic interests in those streams as a result of Defendants' failure to perform its nondiscretionary duties under 33 U.S.C. § 1313(d)(2). *See generally Ohio Valley Environmental Coalition, Inc. v. McCarthy*, Civ. No. 3:15-cv-271, 2016 WL 4744164 (S.D.

W. Va. Sept. 9, 2016). If Defendants are compelled to develop appropriate TMDLs, then the harm to the interests of Plaintiffs' members could be redressed. *Id.*

12. At all relevant times, Plaintiffs were and are "persons" as that term is defined by the Clean Water Act, 33 U.S.C. § 1362(5).

13. Defendant United States Environmental Protection Agency ("EPA") is an independent agency within the United States government that is charged with administering and enforcing various environmental statutes, including the Clean Water Act. *See generally* 33 U.S.C. § 1361. In particular, the EPA is responsible for overseeing and administering the approval and development of TMDLs under 33 U.S.C. § 1313(d)(2).

14. Defendant Michael S. Regan is the Administrator of the United States Environmental Protection Agency. He is charged with the supervision and management of all decisions and actions of that agency, including those taken pursuant to the Clean Water Act with respect to the approval and development of TMDLs under 33 U.S.C. § 1313(d)(2). Mr. Regan is being sued in his official capacity only.

15. Defendant Adam Ortiz is the Regional Administrator of Region III of the United States Environmental Protection Agency. Region III's responsibilities include oversight of the Clean Water Act activities of the State of West Virginia. Pursuant to 40 C.F.R. § 130.7(d)(2), the Administrator of the EPA has delegated his authorities and nondiscretionary duties under 33 U.S.C. § 1313(d)(2) to the Regional Administrators, including Mr. Ortiz. Mr. Ortiz is being sued in his official capacity only.

## STATUTORY AND REGULATORY FRAMEWORK

16. Congress enacted the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The goal

of the Clean Water Act is to eliminate "the discharge of pollutants into the navigable waters," and in the interim, to attain "water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water." 33 U.S.C. § 1251(a)(1) and (2).

17. To achieve those ends, Section 303 of the Clean Water Act requires each State to establish and implement water quality standards, subject to review and approval by EPA. 33 U.S.C. §§ 1313(a)–(c), 1362(3).

18. Water quality standards consist of the "designated uses" of a state's waters and "the water quality criteria for such waters based upon such uses," and "shall be such as to protect the public health or welfare, enhance the quality of water and serve the purposes of" the Clean Water Act. 33 U.S.C. § 1313(c)(2)(A); 40 C.F.R. § 130.2(d).

19. The Clean Water Act requires each State to "identify those waters within its boundaries for which the [technology-based] effluent limitations required by section 1311(b)(1)(A) and section 1311(b)(1)(B) of [the Clean Water Act] are not stringent enough to implement any water quality standard applicable to such waters." 33 U.S.C. § 1313(d)(1)(A).

20. For the waters thus identified, "[e]ach State shall establish . . . the total maximum daily load, for those pollutants which the Administrator identifies under section 1314(a)(2) of this title as suitable for such calculation." 33 U.S.C. § 1313(d)(1)(C). Pursuant to Section 1314(a)(2), EPA has identified "[a]ll pollutants" as being suitable for TMDL calculation. 43 Fed. Reg. 60,665 (Dec. 28, 1978). The Clean Water Act requires that "TMDLs shall be established for all pollutants preventing or expected to prevent attainment of water quality standards." 33 U.S.C. § 1313(d)(1)(C); 40 C.F.R. § 130.7(c)(1)(ii).

21. Section 303(d) further provides that TMDLs "shall be established at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality." 33 U.S.C. § 1313(d)(1)(C). EPA regulations likewise provide that "TMDLs shall be established at levels necessary to attain and maintain the applicable narrative and numerical water quality standards with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality. Determinations of TMDLs shall take into account critical conditions for stream flow, loading, and water quality parameters." 40 C.F.R. § 130.7(c)(1).

22. Under EPA regulations, a TMDL is "[t]he sum of the individual [waste load allocations or "WLAs"] for point sources and [load allocations or "LAs"] for nonpoint sources and natural background." 40 C.F.R. § 130.2(i). A WLA is "[t]he portion of a receiving water's loading capacity that is allocated to one of its existing or future point sources of pollution. WLAs constitute a type of water quality-based effluent limitation." 40 C.F.R. § 130.2(h). An LA is "[t]he portion of a receiving water's loading capacity that is attributed either to one of its existing or future nonpoint sources of pollution or to natural background sources." 40 C.F.R. § 130.2(g).

23. Submission of lists of impaired waters and related TMDLs by states trigger a duty for EPA to "either approve or disapprove such identification and load not later than thirty days after the date of submission." 33 U.S.C. § 1313(d)(2). "If the Administrator disapproves such identification and load, he shall not later than thirty days after the date of such disapproval identify such waters in such State and establish such loads for such waters as he determines necessary to implement the water quality standards applicable to such waters[.]" *Id.*

24. WVDEP and EPA have included hundreds of West Virginia's streams on the State's impaired streams list because of those streams' impairment for failure to meet West Virginia's narrative water quality standards to protect aquatic life. Those streams are considered biologically impaired. The applicable narrative water quality standards prohibit certain in-stream conditions, including "[m]aterials in concentrations which are harmful, hazardous or toxic to man, animal or aquatic life" or a "significant adverse impact to the chemical, physical, hydrologic, or biological components of aquatic ecosystems." 47 W. Va. Code R. § 2-3.2(i), (e).

25. To identify the cause of a stream's biological impairment, EPA has developed a "stressor identification process," which both EPA and WVDEP routinely use.

26. Ionic toxicity is a candidate cause of biological impairment and is frequently identified as the significant stressor in biologically impaired streams. Ionic toxicity results from the presence of excessive amounts of dissolved solids (e.g., mineral salts) in a waterbody. Measurements of electrical conductivity, salinity, and total dissolved solids are often used to characterize the level of ions present within water.

## FACTUAL BACKGROUND

27. WVDEP has never developed a TMDL for ionic toxicity for any stream in West Virginia, despite determining that this particular stressor has caused and continues to cause the biological impairment of hundreds of streams.

28. Due to WVDEP's persistent refusal to develop TMDLs for ionic toxicity, several citizen groups, including the Plaintiffs, filed a citizen suit against EPA in 2015 alleging that EPA had the nondiscretionary duty to develop and promulgate such ionic toxicity TMDLs.

29. In 2017, the Huntington Division of the U.S. District Court for the Southern District of West Virginia held that because WVDEP had not submitted TMDLs for waters biologically

impaired for ionic toxicity, EPA had the nondiscretionary duty to approve or disapprove WVDEP's "constructive submission" of "no TMDLs." *Ohio Valley Environmental Coalition v. Pruitt*, No. 3:15-cv-0271, 2017 WL 600102, at *11–18 (S.D. W. Va. Feb. 14, 2017).

**EPA'S "CONDITIONAL APPROVAL" OF WVDEP'S CONSTRUCTIVE SUBMISSION OF "NO TMDLs" FOR IONICALLY STRESSED STREAMS IN WEST VIRGINIA, INCLUDING IN THE LOWER GUYANDOTTE RIVER WATERSHED**

30. In response to the district court's opinion, EPA "conditionally approved" WVDEP's constructive submission of "no TMDLs" and entered into a Memorandum of Agreement ("MOA") with WVDEP agreeing that WVDEP would develop and submit TMDLs that address ionic toxicity to EPA for approval. U.S. Envtl. Prot. Agency, Decision and Rationale–Conditional Approval of Constructive Submission of No Total Maximum Daily Loads (TMDLs) for Certain West Virginia Waterbodies Listed for Biological Impairment at 1 (Jun. 13, 2017) [hereinafter "EPA's June 13, 2017 Decision"]; Memorandum of Agreement Between the West Virginia Department of Environmental Protection and the United States Environmental Protection Agency Regarding Submission of Total Maximum Daily Loads for Biologically Impaired Waters Pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d) at 2 (June 13, 2017) [hereinafter "MOA"].

31. Pursuant to EPA's "conditional approval" and the MOA, WVDEP was to develop the ionic toxicity TMDLs in accordance with an agreed-upon schedule. Indeed, EPA conditioned its entire approval upon WVDEP's adherence to this agreed-upon schedule. *Id.* at 2; MOA at 2.

32. The agreed-upon schedule required WVDEP to, among other things, establish TMDLs addressing ionic toxicity in 150 listed waters—52 of which are in the Lower Guyandotte River Watershed—no later than December 31, 2021. The remaining required TMDLs were to be

8

developed on a rolling schedule completed by June 30, 2026. EPA's June 13, 2017 Decision at 5; MOA at 2.

33. EPA's "conditional approval" expressly provided that if WVDEP failed to adhere to this schedule, then "EPA's conditional approval **converts automatically . . . and without further administrative process to a disapproval** for the 'constructive submission' of 'no' TMDLs." EPA's June 13, 2017 Decision at 7 (emphasis added).

34. Contemporaneously with "conditionally approving" WVDEP's constructive submission of "no TMDLs," EPA also appealed the district court's opinion to the Fourth Circuit, claiming that the district court misapplied the "constructive submission" doctrine. *Ohio River Environmental Coalition v. Pruitt*, 893 F.3d 225, 229 (4th Cir. 2018).

35. On appeal, the Fourth Circuit "credited EPA's assurances that it will make good-faith efforts . . . to ensure that West Virginia meets the target completion dates" and concluded that WVDEP "ha[d] a credible plan in concert with EPA to produce ionic toxicity TMDLs." *Id.* at 231.

36. Despite the assurances and "credible plan" established in EPA's June 13, 2017 Decision and MOA, WVDEP's deadline of December 31, 2021 passed without WVDEP developing the required TMDLs.

**WVDEP'S ACTUAL AND/OR CONSTRUCTIVE SUBMISSION OF "NO TMDLs" FOR IONICALLY STRESSED STREAMS IN THE LOWER GUYANDOTTE RIVER WATERSHED**

37. On January 4, 2022—after the December 31, 2021 deadline passed—WVDEP submitted certain TMDLs to EPA for the Lower Guyandotte River Watershed.

38. WVDEP did not include any TMDLs addressing ionic toxicity for biologically impaired streams within its 2022 Lower Guyandotte River Watershed TMDLs. In fact, WVDEP expressly stated that it had "suspended biological impairment TMDL development." Tetra Tech,

*USEPA Approved Report: Total Maximum Daily Loads for the Lower Guyandotte River Watershed, West Virginia* at viii, 25 (Feb. 2022) [hereinafter, "2022 Lower Guyandotte TMDLs"].

39. WVDEP's express statement that it had "suspended biological impairment TMDL development" amounted to the **actual submission** of "no TMDL" for streams in the Lower Guyandotte River Watershed for which ionic toxicity TMDLs are required.

40. Alternatively, WVDEP's failure to develop TMDLs for streams in the Lower Guyandotte River Watershed for which ionic toxicity TMDLs are required constitutes the **constructive submission** of "no TMDLs" for that stressor for those streams

41. On February 2, 2022, EPA approved WVDEP's submission of the 2022 Lower Guyandotte TMDLs. EPA's approval expressly recognized that WVDEP had declined to develop any biological impairment TMDLs, but neither approved nor disapproved a submission of "no TMDLs" for ionic toxicity. Letter from Catherine A. Libertz, Director, Water Division, EPA Region III, to Katheryn Emery, Director, Division of Water & Waste Management, WVDEP Re: Approval of Lower Guyandotte Watershed TMDLs (Feb. 2, 2022).

42. Thus, Defendants neither approved nor disapproved West Virginia's **actual submission** of "no TMDLs" for streams in the Lower Guyandotte River Watershed for which ionic toxicity TMDLs are required.

43. Additionally, Defendants neither approved nor disapproved West Virginia's **constructive submission** of "no TMDLs" for streams in the Lower Guyandotte River Watershed for which ionic toxicity TMDLs are required.

44. To date, Defendants have not developed or promulgated their own ionic toxicity TMDLs for streams in the Lower Guyandotte River Watershed for which such TMDLs are required.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**(Failure to Perform Nondiscretionary Duty to Develop TMDLs Triggered by West Virginia's Failure to Comply With Agreed Schedule for the Lower Guyandotte River Watershed)**

45. Plaintiffs incorporate by reference all allegations contained in Paragraphs 1 through 44, *supra*.

46. As expressly stated in the terms of the decision, EPA's June 13, 2017 Decision automatically converted to a disapproval of WVDEP's constructive submission of "no TMDLs" upon WVDEP's failure to adhere to the agreed-upon schedule.

47. As a result of WVDEP failing to adhere to the agreed-upon schedule, EPA's "conditional approval" automatically converted to a disapproval of WVDEP's constructive submission of "no TMDLs" and triggered Defendant's nondiscretionary duty to develop ionic toxicity TMDLs for certain streams in the Lower Guyandotte River Watershed identified in the MOA pursuant to 33 U.S.C. § 1313(d)(2) and 40 C.F.R. § 130.7(d)(2).

48. To date, Defendants have not developed the necessary TMDLs in the Lower Guyandotte River Watershed in accordance with 33 U.S.C. § 1313(d)(2).

49. In failing to develop the necessary TMDLs for streams in the Lower Guyandotte River Watershed for which ionic toxicity TMDLs are required, Defendants have failed to perform nondiscretionary acts and duties under the Clean Water Act.

### SECOND CLAIM FOR RELIEF
**(Failure to Perform Nondiscretionary Duty to Develop TMDLs Triggered by West Virginia's Actual Submission of "No TMDLs" for Biologically Impaired Streams in the Lower Guyandotte River Watershed)**

50. Plaintiffs incorporate by reference all allegations contained in paragraphs 1 through 49, *supra*.

51. Defendants are required by 33 U.S.C. § 1313(d)(2) and 40 C.F.R. § 130.7(d)(2) to approve or disapprove TMDLs submitted by States "not later than 30 days after the date of submission." If Defendants disapprove of a State's submission, they must then establish TMDLs themselves "for such waters as [they] determine[] necessary to implement the water quality standards applicable to such waters." 33 U.S.C. § 1313(d)(2). Those duties are non-discretionary.

52. West Virginia's actual submission of "no TMDLs" for streams in the Lower Guyandotte River Watershed for which ionic toxicity TMDLs are required on or about January 4, 2022, through its statements in the 2022 Lower Guyandotte River Watershed TMDLs that it would not develop such TMDLs, triggered Defendants' nondiscretionary duties (a) to disapprove West Virginia's submission and (b) to develop TMDLs for those streams to implement the applicable narrative water quality standards.

53. Defendants failed to perform those duties.

54. To date, Defendants have neither (a) disapproved of West Virginia's actual submission of "no TMDLs" for streams in the Lower Guyandotte River Watershed for which ionic toxicity TMDLs are required nor (b) developed their own TMDLs for those streams.

55. In failing to perform the acts specified in Paragraph 53, Defendants have failed to perform nondiscretionary acts and duties under the Clean Water Act.

### THIRD CLAIM FOR RELIEF
**(Failure to Perform Nondiscretionary Duty to Develop TMDLs Triggered by West Virginia's Constructive Submission of "No TMDLs" for Biologically Impaired Streams in the Lower Guyandotte River Watershed)**

56. Plaintiffs incorporate by reference all allegations contained in paragraphs 1 through 55, *supra*.

57. West Virginia's constructive submission of "no TMDLs" for streams in the Lower Guyandotte River Watershed for which ionic toxicity TMDLs are required triggered Defendants'

12

nondiscretionary duties (a) to disapprove West Virginia's submission and (b) to develop TMDLs for those streams to implement the applicable narrative water quality standards.

58. Defendants failed to perform those duties.

59. To date, Defendants have neither (a) disapproved of West Virginia's constructive submission of "no TMDLs" for streams in the Lower Guyandotte River Watershed for which ionic toxicity TMDLs are required nor (b) developed their own TMDLs for those streams.

60. In failing to perform the acts specified in Paragraph 58, Defendants have failed to perform nondiscretionary acts and duties under the Clean Water Act.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter an Order:

1. Declaring that Defendants have failed to perform nondiscretionary duties required by the Clean Water Act, including their failure to develop ionic toxicity TMDLs for streams in the Lower Guyandotte River Watershed for which such TMDLs are required and their failure to approve or disapprove West Virginia's actual and/or constructive submission of "no TMDLs" for those streams;

2. Ordering Defendants to disapprove West Virginia's actual and/or constructive submission of "no TMDLs" for streams in the Lower Guyandotte River Watershed for which ionic toxicity TMDLs are required;

3. Ordering Defendants to develop, as soon as possible, ionic toxicity TMDLs for streams in the Lower Guyandotte River Watershed for which such TMDLs are required;

4. Retaining jurisdiction over this action to ensure compliance with the Court's decree;

5. Awarding Plaintiffs their costs of litigation (including attorneys' fees and expert witness costs); and

6. Granting such other relief as the Court deems just and proper.

DATED: March 18, 2023                    Respectfully submitted,

**/s/ Derek O. Teaney**
DEREK O. TEANEY (WVBN 10223)
ELIZABETH A. BOWER (WVBN 13589)
APPALACHIAN MOUNTAIN ADVOCATES, INC.
P.O. Box 507
Lewisburg, WV 24901
Telephone: (304) 646-1182
Email: dteaney@appalmad.org

*Counsel for Plaintiffs*