IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON

SIERRA CLUB; WEST VIRGINIA
HIGHLANDS CONSERVANCY, INC.; and
WEST VIRGINIA RIVERS COALITION, INC.;

    Plaintiffs,

v.                                          CIVIL ACTION NO. 3:24-cv-00130

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; MICHAEL S.
REGAN, Administrator, United States
Environmental Protection Agency; and
ADAM ORTIZ, Regional Administrator,
United States Environmental Protection
Agency, Region III,

    Defendants.

### REPLY IN SUPPORT OF MOTION OF THE WEST VIRGINIA COAL ASSOCIATION TO INTERVENE AS A DEFENDANT

Plaintiffs advance two misguided arguments to oppose the West Virginia Coal Association's ("WVCA") intervention. First, Plaintiffs argue that the Court must reach the same conclusion it did nearly a decade ago when it found that the WVCA did not have a protectable interest in this litigation because "this Court cannot even begin to speculate on several matters that are pertinent to whether this Court's ruling will have *any effect at all* down the road on WVCA members' permits…." *Ohio Valley Envtl. Coalition, Inc. v. McCarthy*, 313 F.R.D. 10, 20 (S.D.W. Va. 2015). But this case is different. The proposed Consent Decree focuses on a narrow set of watersheds where EPA has spent considerable efforts to identify the landowners of existing coal-related discharge points and the holders of coal-related NPDES permits for those same discharges—all for the purpose of assigning "load" limitations on "ionic toxicity" to the coal

1

industry. Nor is there anything theoretical or vague about the "load" limitations that EPA will assign. At EPA's request, its contractor has spent the past several years identifying "endpoints" for so-called ionic toxicity. That is, they have already conducted work to identify allowable in-stream loads that will be assigned to discharges from the in-stream ponds necessary to the surface mining industry. It is, therefore, a fantasy to imagine that the proposed Consent Decree will do anything but result in "ionic toxicity" effluents for the coal industry—a fact the Plaintiffs have announced is their express goal. *See* discussion *infra*.

Second, Plaintiffs claim that a legally binding Consent Decree obligating EPA to develop ionic toxicity TMDLs would not impair any of the WVCA's interests because the WVCA can later challenge the specific ionic toxicity TMDLs once proposed by EPA. This argument overlooks the fact that the WVCA is challenging the very legality of an ionic toxicity TMDL in the first place. "Ionic toxicity" itself is not a pollutant; thus, there is no grounds for developing a TMDL for it. Moreover, in listing streams as impaired for ionic toxicity based on the WVSCI, EPA and WVDEP have unlawfully treated the WVSCI as a *de facto* water quality standard without putting it through the rulemaking process and getting approval by the West Virginia Legislature. And, finally, as this Court knows from its proceedings in *OVEC et al. v. Fola Coal Company,* Civil Action Nos. 2:13-cv-5006, there is no practicable treatment for "ionic toxicity." Thus, EPA's effort to override WVDEP's decision to delay TMDLs for "ionic toxicity" is a serious, unreasonable and unlawful intrusion on WVDEP's authority that is designed to load costs on the coal industry before identifying either a "pollutant" or a solution. Thus, there are serious questions regarding the legality of developing an ionic toxicity TMDL that must be decided *before* EPA commits itself to developing one. Finally, despite Plaintiffs generous offer that all these issues

may be examined during EPA's TMDL development and in a subsequent challenge to that action, it is not at all clear that EPA would not oppose subsequent review of a completed TMDL

I. **THE WVCA IS ENTITLED TO INTERVENE AS OF RIGHT.**

   a. *Developments Since the 2015 Litigation Have Eliminated any Speculation that EPA's Development of TMDLs will Harm the WVCA's Interests.*

Plaintiffs claim that "[t]here are still 'too many steps' between a judgment in this action and any potential consequences to WVCA's interests,"[1] as though Plaintiffs are unaware that EPA has been taking those "many steps" over the past three years. Furthermore, contrary to Plaintiffs' assertions, it is not "still entirely speculative what, if any, economic impact the TMDLs might have on the WVCA's members, regardless of the Proposed Consent Decree." *Id.*

The WVCA has learned that EPA has worked for at least the past three years to develop "TMDL endpoints" for the express purpose of establishing a *de facto* water quality standard surrogate for "ionic toxicity" to be used in establishing new NPDES permit limits for discharges from coal operators in the Lower Guyandotte watershed. *See* Exhibit 1, *Endpoint Analysis and Implementation Overview: Technical Support for West Virginia Ionic Toxicity TMDLs Endpoint Development* (April 2, 2021) (relevant portions attached).[2] Moreover, in formulating ionic toxicity TMDL endpoints, EPA's TMDL contractor states that it was expressly charged with targeting the coal industry:

> This project included a charge to provide detailed information about model inputs that are associated with NPDES permitted <u>mining outlets</u>. This compilation, *Mining Permitted Source Summary* provided in Appendix A and supplemented by a GIS project,

---

[1] *See* Plaintiffs' Response, p. 6 (ECF #21).

[2] This document was prepared by environmental consulting group, Tetra Tech, at the request of EPA, Region 3 for the express purpose of establishing endpoints that would correlate to values linked to the target value in WVDEP's current assessment methodology for determining biological impairment—the *de facto* water quality standard, which has not been through rule-making—the West Virginia Stream Condition Index for the Lower Guyandotte Watershed.

3

> includes information regarding <u>permit responsible parties</u>, permit and outlet status, outlet location, associated Surface Mining Control Reclamation Act (SMCRA) permits, <u>and outlet property ownership.</u>

*See* Exhibit 2, *Draft Assessment of Potential Treatment Technologies to Reduce Ion Loadings to Biologically-Impaired Streams with Ionic Stressors in the Lower Guyandotte River Watershed of WV*, § 3.1 (Sept. 12, 2022) (emphasis supplied) (relevant portions attached). Plaintiffs cannot claim that impact to the WVCA's members is speculative when they have announced that the goal of the TMDLs is "holding the coal industry accountable…." *See* https://www.sierraclub.org/press-releases/2024/03/environmental-groups-secure-historic-settlement-restore-west-virginia (last accessed June 13, 2024). Thus, there can be no question that EPA's ionic toxicity TMDLs will impact coal NPDES permits—their development has been explicitly aimed at coal NPDES permits in a clear abuse of the TMDL process.

Furthermore, the WVCA now knows without a doubt that, once EPA's ionic toxicity endpoints are incorporated into coal NPDES permits, they will impose substantial treatment costs on those permits because this EPA-commissioned study on potential treatment solutions for ionic toxicity concludes that "the known technologies that can reliably achieve the necessary reduction performance are simultaneously the most expensive, complex and energy demanding." *Id.*, § 6.0. Although EPA's contractor does not even appear to know enough about treatment for ionic toxicity to put a cost estimate on such treatment, this Court has previously heard evidence in cases such as *OVEC et al. v. Fola Coal Company,* Civil Action Nos. 2:13-cv-5006, that the costs to remove mine drainage ions from surface water would exceed $136 million (reduced to present value) at a single pond. *See* Case No. 2:13-cv-5006, Trial Transcript at p. 116 (testimony of Al Meek). Those types of costs will be ruinous for landowners and NPDES permit

4

holders charged with meeting TMDL-based limits that EPA's contractor has already tentatively derived for the streams in these watersheds.

Moreover, the astronomical costs of treating water for "ionic toxicity" are not guaranteed to be borne solely by coal NPDES permit holders who discharge directly the streams listed in the proposed Consent Decree. The proposed Consent Decree would obligate EPA to develop "ionic toxicity" TMDLs for eleven streams in the Lower Guyandotte watershed, some of which ERP Environmental Fund, Inc. discharges to. As this Court is aware from Civil Action No. 3:11-cv-0115, ERP has been placed into receivership by WVDEP. If reclamation of ERP's former mines is ultimately assumed by WVDEP's Special Reclamation Fund and Special Reclamation Water Trust Fund, which are funded by a tax on coal pursuant to W.Va. Code §22-3-11(i)(1)(B), all mine operators in the state face the potential of higher special reclamation taxes in order to maintain the solvency of the SRF fund in the face of the ruinous costs of treating for "ionic toxicity." *See West Virginia Highlands Conservancy, Inc. v Huffman*, 588 F. Supp. 2d 676, 682 (N.D. W.Va. 2009).

Ultimately, this sue-and-settle case stands in a wildly different posture than the previous one because EPA has been taking the "' many steps' between a judgment in this action and any potential consequences to WVCA's interests" behind the scenes for the past few years. EPA and Plaintiffs are both aware, and perhaps desirous, that the outcome of these ionic toxicity TMDLs will be a ruinously expensive compliance burden on the WVCA's members. The WVCA must be granted intervention in order to advocate that the TMDL process follows science rather than an anti-mining agenda.

### b. *The WVCA has a Protectable Interest in Intervening in this Action to Oppose the Development of Ionic Toxicity TMDLs.*

Even if the parties and the Court ignore the fact that EPA has already developed ionic toxicity endpoints, the WVCA still has an interest in intervening in this suit to oppose a Consent Decree that would commit EPA to develop ionic toxicity TMDLs in the first place. As Plaintiffs readily acknowledge, they anticipate entering into a consent decree pursuant to which "the Environmental Protection Agency ("EPA") would propose by October 2024, and finalize by January 15, 2025, ionic toxicity TMDLs for certain streams in the Lower Guyandotte River Watershed." Plaintiffs' Response, p. 3 (ECF 21). However, the proposed "ionic toxicity TMDLs" are inconsistent with the Clean Water Act ("CWA")—regardless of their specific content—because, *inter alia*, the CWA authorizes TMDLs only on "pollutants," and "ionic toxicity" is not a pollutant. *See, e.g., Virginia Dept. of Transp. v. U.S. E.P.A.*, No. 1:12-CV-775, 2013 WL 53741 (E.D. Va. Jan. 3, 2013) (holding that EPA does not have authority to establish TMDLs for non-pollutants and rejecting EPA's attempt to use stormwater flow as a surrogate for sediment in establishing TMDL aimed at addressing benthic impairment due to sediment loading). Indeed, neither WVDEP nor EPA have identified a "pollutant" responsible for the so-called "ionic toxicity" tied to the supposed impairment.

Yet the proposed Consent Decree irrevocably commits EPA to finalize ionic toxicity TMDLs before it identifies a "pollutant." Before it can approve the Consent Decree, this Court must decide whether or not the CWA even authorizes such a thing as an ionic toxicity TMDL, and excluding WVCA from that process will prejudice its interest. *See Nat. Res. Def. Council v. Costle*, 561 F.2d 904, 909 (D.C. Cir. 1977). Absent intervention, the proposed Consent Decree will deprive WVCA of any meaningful opportunity to address this issue during the

6

regulatory process, forcing it to return to this Court to litigate its claims after the TMDLs have been finalized. That is wasteful, inefficient, and unfair. *See id.*

This is the only forum in which to litigate this issue, (*see Monongahela Power Co. v. Chief, Off. of Water Res., Div. of Env't Prot.*, 211 W. Va. 619, 630, 567 S.E.2d 629, 640 (2002)), and it must be addressed before the Court enters an order requiring EPA to establish the TMDLs. *See Bragg v. Robertson*, 54 F. Supp. 2d 653, 670 (S.D.W. Va. 1999).

Ultimately, the Court has a duty to ensure that its judgment is "fair, adequate, reasonable, and faithful to the environmental statutes under which the litigation was brought" and must therefore pass upon the legitimacy of the proposed TMDLs before it enters a consent decree or other judgment requiring EPA to finalize them. *Id.* at 670. In other words, the propriety of the proposed ionic toxicity TMDLs is a common question of law that this Court must address whether or not WVCA is permitted to intervene, and as it stands, WVCA is the only party asserting that TMDLs cannot be established for ionic toxicity. As the decree will render any attempt to address the validity of the proposed TMDLs during the regulatory process futile, the Court should afford WVCA the opportunity to address these concerns now.

Notwithstanding Plaintiffs' contentions to the contrary, the proposed Consent Decree undoubtedly renders WVCA's interest less attenuated than it was in the 2015 litigation. The Decree does not merely mandate that the EPA begin the administrative process of promulgating TMDLs for ionic toxicity in the Lower Guyandotte River Watershed; it requires EPA to finalize these TMDLs by January 15, 2025. As such, the Decree would completely eliminate EPA's discretion to conclude, based upon the comments it receives from WVCA and other stakeholders, that ionic toxicity should not be the subject of a TMDL. For this reason alone, WVCA should be granted intervention.

### *c. Absent Intervention, WVCA's Interest Will be Impaired by This Action.*

WVCA's interest will be directly and adversely impacted by a decree requiring EPA to establish ionic toxicity TMDLs in the Lower Guyandotte River Watershed. As explained above, WVCA submits that ionic toxicity TMDLs are unlawful regardless of their specific content, and while WVCA would ordinarily be able to voice these concerns during the EPA's notice and comment process, the Consent Decree would essentially deprive WVCA of that forum. Having committed itself to a TMDL in a consent order, the EPA could not, presumably, review WVCA's comments and conclude that it should not finalize the proposed TMDLs. The outcome of the regulatory process would, in that respect, be a forgone conclusion because EPA's discretion would be bound by the terms of the Consent Decree. Accordingly, the appropriate place to litigate this issue is here and now. Were the Court to enter an order requiring EPA to establish TMDLs without providing WVCA with an opportunity to brief the issue, it would prejudice WVCA's interest.

Not only would the Consent Decree deprive WVCA of a meaningful opportunity to participate in the regulatory process, it would also taint any future challenge WVCA might bring before this Court. As Plaintiffs have acknowledged (*See* Plaintiffs' Response, p. 9), if WVCA is dissatisfied with the TMDLs—and rest assured it will be—its only recourse will be to come back before this Court with the same issues that could have been addressed here. *See Monongahela Power Co*, 211 W. Va. at 630, 567 S.E.2d at 640 (holding that, while "EPA decisions concerning 303(d) lists and Total Maximum Daily Loads are reviewable in United States district courts": West Virginia circuit courts and the Environmental Quality Board do not have jurisdiction to review EPA's TMDLs). Forcing WVCA to wait and bring these arguments after the Consent Decree has been entered and the TMDLs have been finalized is wasteful and inefficient and forces WVCA to argue from a position of weakness that it ought not to be put in in the first place.

WVCA's interest would clearly be more practically served by intervention than subsequent review. *See Costle*, 561 F.2d at 909. In *Costle*, the D.C. Circuit held that movants should have been permitted to intervene because "if [plaintiff] contests an EPA decision to exclude a specific pollutant, [movants], without intervention, would not be entitled to participate before the District Court in its review of this crucial initial decision" and movants' "only recourse, without intervention, would be to file comments and then litigate the regulations after promulgation." *Id*. at 910. The D.C. Circuit further explained that the District Court erred in denying movants' motion to intervene because it failed to consider "the possible ***impairment to [movants'] interest that may ensue from their exclusions from proceedings on these key decisions on what not to regulate***." *Id*. (emphasis added). That is precisely what stands to happen here. WVCA submits that "ionic toxicity" should not be subject to a TMDL at all, and unless WVCA is permitted to intervene in this action, it will be excluded from a key decision concerning what to regulate. Its only recourse will be to file comments (a futile gesture) and return to this Court to litigate its claims after the TMDLs have been promulgated.

Moreover, it is not a foregone conclusion that a judicial forum will be available to the WVCA to raise its objections later.[3] Given that lack of certainty and the West Virginia

---

[3] The WVCA believes it would have standing to challenge a later-issued TMDL. S*ee, e.g., Am. Farm Bureau Fed'n v. U.S. E.P.A*., 792 F.3d 281, 293-294 (3d Cir. 2015) (holding that dischargers had standing to challenge TMDL even though "we do not know precisely what form new regulations will take" because "regulated entities that assert likely economic injury have standing even before the challenged regulatory action fully takes effect" and "[i]f there is something wrong with the TMDL, it is better to know now than later."); *see also City of Kennett, Missouri v. Env't Prot. Agency*, 887 F.3d 424, 431 (8th Cir. 2018) (noting that "[t]o say that the permit will comply with the TMDL is not 'conjectural'" and holding that City could challenge "TMDL that requires more stringent limits for the City" even though "Missouri, with EPA's approval, could promulgate a new DO criterion and change the TMDL before implementation[.]"). However, EPA has moved to dismiss such challenges to TMDLs by NPDES permit holders and succeeded at the district court level. *See City of Kennett, Missouri v. U.S. Envtl. Protec. Agency*, No. 1:14-CV-33-SNLJ, 2017 WL 769831, at *4 (E.D. Mo. Feb. 28, 2017), aff'd in part, vacated in part *sub nom. City of Kennett, Missouri v. Envtl. Protec. Agency*, 887 F.3d 424 (8th Cir. 2018) (holding at district court that plaintiffs lacked standing). The WVCA is unaware of any controlling precedent in the Fourth Circuit on this issue.

9

Supreme Court's holding that TMDLs may not be challenged in state court, this may be the only time and place the WVCA is afforded an opportunity to oppose this abuse of the TMDL process.

Finally, in opposing intervention, Plaintiffs do not respond to the WVCA's argument that, if Plaintiffs have standing to bring the suit as users of the streams in question, the WVCA must likewise have standing to intervene because its members also use those streams. *See* ECF # 18, p. 8 (WVCA MOL in Supp. of Mot. To Intervene). Plaintiffs provide no meaningful discussion of their standing to bring the citizen suit under the Clean Water Act, simply stating that "Plaintiffs' members use streams in the Lower Guyandotte River Watershed that are biologically impaired because of ionic toxicity and suffer cognizable injuries to their aesthetic, recreational, environmental, and/or economic interests in those streams as a result of Defendants' failure to perform its nondiscretionary duties under 33 U.S.C. § 1313(d)(2)." Complaint, ¶ 11.

Plaintiffs offer no concrete evidence that they use the *particular* streams that are subject to the proposed Consent Decree. In stark contrast, members of the WVCA use some of the *particular* streams that are subject to the proposed Consent Decree. Its members have a protected designated use under Category E of the West Virginia Water Quality Standards. *See* W.Va. Code R. § 47-2-6.6.

As Plaintiffs claim to have suffered cognizable injuries due to the lack of TMDLs for biological impairment on the Lower Guyandotte, WVCA members will "suffer cognizable injuries to their … economic interests in those streams" if the parties to the lawsuit are allowed to proceed with the poorly conceived Proposed Consent Decree. WVCA challenges the nexus between biological impairment and "ionic toxicity." This relationship is accepted as fact by the Proposed Consent Decree. WVCA's only opportunity to challenge this nexus is prior to entry of

the Consent Decree. Accordingly, WVCA's standing is equal to Plaintiffs as protected users of the precise streams that will receive ionic toxicity TMDLs under the Consent Decree.

### d. *WVDEP Does Not Adequately Represent the WVCA's Interest.*

WVDEP does not share WVCA's interest in preventing the development of TMDLs for ionic toxicity. Rather, WVDEP has intervened to assert "its statutory right to establish priorities for the TMDL program and to develop TMDLs for pollutants which cause or contribute to ionic toxicity." WVDEP's MOL, p. 6 (ECF 8). That is, while WVDEP may share WVCA's objective of preventing EPA from developing TMDLs for ionic toxicity, it does not share WVCA's broader objective of ensuring that TMDLs for ionic toxicity are not developed. WVDEP has not suggested, as WVCA does, that ionic toxicity cannot be the subject of a TMDL. Rather, WVDEP is concerned that it has been kept in the dark and cut out of Plaintiffs' negotiations with EPA. *See id.*

Again, WVCA is the only party asserting that TMDLs cannot be established for ionic toxicity under the CWA. The Court must consider the "impairment to [WVCA's] interest that may ensue from [its] exclusions from proceedings on these key decisions on what not to regulate." *See Costle*, 561 F.2d at 909. Indeed, in *Costle* the D.C. Circuit held that "[e]ven if the interests of EPA and [movants] can be expected to coincide, such as on the exclusion of a specific pollutant from regulation, that does not necessarily mean that adequacy of representation is ensured for purposes of Rule 24(a)(2)." *Id*. at 19. Here, EPA clearly does not share WVCA's opinion that ionic toxicity is not a pollutant and cannot be the subject of a TMDL and WVDEP has not even taken a position on this issue. None of the parties, therefore, adequately represent WVCA's interest. *See id*.

Moreover, courts have routinely held that regulated industries should be accorded intervenor status notwithstanding government involvement.[4] Here, no party adequately represents the collective interest of West Virginia coal producers the way that the WVCA could because the WVCA has a specific interest in avoiding the unwarranted or unsupported imposition of numeric NPDES effluent limits for conductivity. Accordingly, the WVCA will uniquely contribute to this Court's understanding of the issues by adding a perspective from the viewpoint of West Virginia's coal producers.

## II. ALTERNATIVELY, THE COURT SHOULD ALLOW PERMISSIVE INTERVENTION.

Contrary to Plaintiffs' assertions, WVCA has specifically identified and explained how its claims and defenses have questions of law and fact in common with the main action. Namely, WVCA raises issues relating to the fairness, adequacy, reasonableness, and validity of the proposed Consent Decree; questions that this Court has a duty to adjudicate whether or not WVCA is permitted to intervene. *See Bragg v. Robertson*, 54 F. Supp. 2d at 670. Allowing WVCA to intervene in this matter so that these issues can be properly developed through the adversarial process will not, as Plaintiffs contend, create an undue delay. Rather, it will ensure that whatever compromise is reached is "fair, adequate, reasonable, and faithful to the environmental statutes under which the litigation was brought." *Id.* What Plaintiffs really advocate for is undue haste,

---

[4] *See, e.g., NRDC v. U.S. Nuclear Regulatory Commission*, 578 F.2d 1341 (10th Cir. 1978) (allowing trade association and member of industry to intervene despite district court's holding that their interests were adequately represented not only by government, but also by another industry intervenor); *National Farm Lines v. ICC*, 564 F.2d 381, 383-84 (10th Cir. 1977) (stating that representation of interested private parties by government in such circumstances is "a task which is on its face impossible"); *Planned Parenthood of Minnesota Inc. v. Citizens for Community Action*, 558 F.2d 861, 870 (8th Cir. 1977) (allowing private property owners to intervene because City Council members would not adequately represent their interests); *New York Public Interest Research Group, Inc. v. Regents*, 516 F.2d 350, 352 (2d Cir. 1975) ("there is a likelihood that the [intervenor] will make a more vigorous presentation of the economic side of the argument than would the [Government]"); *Hodgson v. United Mine Workers*, 473 F.2d 118, 130 (D.C. Cir. 1972) (holding intervention by union members proper because otherwise Secretary of Labor would be forced to serve as both public official and lawyer for union members, to the possible detriment of their interests).

12

silencing dissent so that they can hammer through a Consent Decree requiring the EPA to finalize ionic toxicity TMDLs without giving any serious consideration as to whether the CWA even authorizes ionic toxicity TMDLs in the first instance.

This Court has a duty to ensure that the proposed ionic toxicity TMDLs are consistent with the CWA and other applicable law before it enters a decree requiring EPA to establish such TMDLs. *See Bragg*, 54 F. Supp. 2d at 670. And, none of the parties before the Court share WVCA's interests in challenging the validity of ionic toxicity TMDLs as a class. Again, "[i]f there is something wrong with the[se] TMDL[s], it is better to know now than later." *See Am. Farm Bureau Fed'n v. U.S. E.P.A.*, 792 F.3d 281, 294 (3d Cir. 2015). Permitting WVCA to intervene will allow for the development and resolution of this critical issue, better serve to protect WVCA's interests, and potentially avoid the need for subsequent litigation. Therefore, the Court should allow WVCA to intervene even if it concludes that WVCA does not have the right to do so.

## CONCLUSION

For the foregoing reasons, WVCA respectfully requests that this Court grant its Motion to Intervene.

Respectfully submitted,

WEST VIRGINIA COAL ASSOCIATION

By Counsel

/s/ Christopher M. Hunter
Robert G. McLusky (WVBN 2489)
Christopher M. Hunter (WVBN 9768)
JACKSON KELLY PLLC
1600 Laidley Tower
P.O. Box 553
Charleston, West Virginia 25322

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON

**SIERRA CLUB; WEST VIRGINIA
HIGHLANDS CONSERVANCY, INC.; and
WEST VIRGINIA RIVERS COALITION, INC.,**

    **Plaintiffs,**

v.                                                                  CIVIL ACTION NO. 3:24-cv-00130

**UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; MICHAEL S.
REGAN, Administrator, United States
Environmental Protection Agency; and
ADAM ORTIZ, Regional Administrator,
United States Environmental Protection
Agency, Region III,**

    **Defendants.**

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of June 2024, I filed the foregoing pleading with the Clerk of the Court using the CM/ECF system which will cause a copy to be served upon counsel of record.

                                                                   /s/ Christopher M. Hunter
                                                                   Christopher M. Hunter (WVBN 9768)