IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

## HUNTINGTON DIVISION

SIERRA CLUB;
WEST VIRGINIA HIGHLANDS CONSERVANCY, INC., and
WEST VIRGINIA RIVERS COALITION, INC,

          Plaintiffs,

v.                                CIVIL ACTION NO. 3:24-0130

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY;
MICHAEL S. REGAN, Administrator,
United States Environmental Protection Agency; and
ADAM ORTIZ, Regional Administrator,
United States Environmental Protection Agency, Region III,

          Defendants.

## MEMORANDUM OPINION & ORDER

Before the Court is West Virginia Coal Association's Motion to Intervene as a Defendant. *See* ECF No. 17. The Court **DENIES** the Motion.

## BACKGROUND

## I

The Clean Water Act aims to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To realize this goal, the Act requires EPA and States to participate in a "comprehensive" and "all-encompassing program" of water pollution regulation. *Milwaukee v. Illinois*, 451 U.S. 304, 317 (1981). This case implicates one part of this program—the total maximum daily load ("TMDL") system. *See* Compl. ¶¶ 45–60, ECF No. 1.

## A

States—subject to EPA's approval—must establish "water quality standards" for navigable waters within their borders. *See* 33 U.S.C. § 1313(a). These standards "consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses." *Id.* § 1313(c)(2)(A). States must regularly review their water quality standards and modify them "as appropriate." *Id.* § 1313(c)(1).

To achieve water quality standards, the Clean Water Act imposes "effluent limitations." *See id.* §§ 1311(b)(1)(A), (B). An "effluent limitation" is "any restriction . . . on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into" certain waters. *Id.* § 1362(11). A "point source" is "any discernible, confined and discrete conveyance . . . from which pollutants are or may be discharged." *Id.* § 1362(14). *See also Am. Farm Bureau Fed. v. U.S. E.P.A.*, 792 F.3d 281, 289 (3d Cir. 2015) (listing drainpipes at wastewater treatment plants as an example).

The Clean Water Act anticipates point-source effluent limitations will be the "front line" defense against water pollution. *Id.* But the Act is not naïve. It recognizes point-source effluent limitations may not protect all waters. To fill this gap, the Act requires States to "identify those waters within [their] boundaries for which the effluent limitations" of point sources are "not stringent enough to implement any water quality standard applicable to such waters." 33 U.S.C. § 1313(d)(1)(A). These are called "impaired waters." *See, e.g.*, *Ohio Valley Envtl. Coal., Inc. v. Pruitt*, 893 F.3d 225, 227 (4th Cir. 2018) (using term).

States must provide EPA with their list of impaired waters alongside a "total maximum daily load" for certain pollutants "from time to time." 33 U.S.C. §§ 1313(c)(1)), (e)(2). A TMDL is "[t]he sum of the individual [waste load allocations] for point sources and [load allocations] for

nonpoint sources and natural background." 40 C.F.R. § 130.2(i). Said succinctly: a TMDL sets the maximum daily discharge of a particular pollutant into a water. *See Pruitt*, 893 F.3d at 227.

When States provide their impaired water lists and TMDLs directly to EPA, they make an "actual submission." Sometimes, however, States neglect or refuse to provide their information to EPA. If this apathy or defiance persists long enough, the State's inaction may become a "constructive submission" of "no TMDLs" to EPA. *See id.* at 229–230 (reviewing caselaw).

Regardless of whether States actually or constructively submit their TMDLs to EPA, EPA must review them within thirty days. *See* 33 U.S.C. § 1313(d)(2). If it disapproves of a TMDL, EPA must issue its own TMDL within thirty days of the State's submission. *See id.*

Once issued, TMDLs are "not self-executing." *Am. Farm Bureau Fed.*, 792 F.3d at 291. Instead, they are "informational tools," *Pronsolino v. Nastri*, 291 F.3d 1123, 1129 (9th Cir. 2002), and "cornerstones" for other pollution-reduction plans, *Am. Farm Bureau Fed.*, 792 F.3d at 291.

One of these other pollution-reduction plans is the National Pollution Discharge Elimination System. *See* 40 C.F.R. § 130.7(a) (explaining how to "incorporat[e]" a TMDL into a state-NPDES permit system). Under this system, point-source operators must obtain a permit before discharging any pollutant into a body of water. *See* 33 U.S.C. §§ 1342(a), (b) (establishing federal and state systems); *id.* § 1362(12) (defining "discharge of a pollutant" as the "addition of any pollutant" into certain waters). These permits must be consistent with the wasteload allocations created in EPA-approved TMDLs. *See* 40 C.F.R. § 122.44(d)(1)(vii)(B).

EPA—or by delegation, States—can issue NPDES permits. *See Stewards v. A&G Coal Corp.*, 758 F.3d 560, 563 (4th Cir. 2014). Since 1982, EPA has delegated authority to issue NPDES permits to West Virginia. *See State ex rel. Bell v. Cummings*, 540 S.E.2d 917, 921 n.2 (W. Va. 1999). As a result, the Mountain State administers its own NPDES permit program through the

West Virginia Department of Environmental Protection. *See* W. Va. Code § 22-11-4(a)(1). Despite this autonomy, WVDEP must provide advance notice to EPA before it issues any NPDES permit. *See* 33 U.S.C. § 1342(d)(1). If EPA objects to the permit as "outside the guidelines and requirements" of the Clean Water Act, "[n]o permit shall issue." *Id.* § 1342(d)(2). *See also* 40 C.F.R. §§ 123.44 ("EPA review of and objections to State permits"); 123.29 ("State permit programs shall provide that no permit shall be issued when the Regional Administrator has objected in writing under § 123.44."). State-issued NPDES permits must be for "fixed terms not exceeding five years." 33 U.S.C. § 1342(b)(1)(B).

## II

West Virginia has "long resisted" the Clean Water Act. *Pruitt*, 893 F.3d at 227–28 (reviewing this history). This case is yet another chapter in this tortured tale.

## A

Under state law, West Virginia identifies impaired waters based on narrative water quality standards—including measuring "[m]aterials in concentrations which are harmful . . . to man, animal, or aquatic life." *Id.* at 228 (quoting W. Va. Code § 47-2-3.2(e)).

For years, WVDEP used the West Virginia Stream Condition Index to identify impaired waters. *See id.* Using this metric, WVDEP identified 573 impaired waters. *See id.* For some of these waters, WVDEP identified the "cause of impairment" as "ionic toxicity." *Id.*

In 2012, the West Virginia State Legislature changed course. It directed WVDEP to develop a new tool to measure the health of the State's waters and to replace the Index. *See id.* (citing W. Va. Code § 22-11-7b(f)). Interpreting this direction, WVDEP "postpone[d]" the development of future TMDLs for impaired waters until it finalized this new tool. *Id.*

-4-

By 2015, WVDEP showed no progress. *See id.* Tired, environmental organizations sued EPA. *See id.* They alleged EPA failed to treat WVDEP's prolonged failure to develop ionic toxicity TMDLs as a "constructive submission" of no TMDLs. *See id.* As a result, EPA failed "to promulgate TMDLs for [certain] biologically impaired waters." *Id.*

The West Virginia Coal Association asked to join the suit. *See Ohio Envtl. Coal. v. McCarthy*, 313 F.R.D. 10, 15–16 (S.D. W. Va. 2015). This Court said no. *See id*. at 32.

After discovery, this Court agreed with the plaintiffs. This Court ordered EPA to "approve or disapprove" WVDEP's "constructive submission" of no TMDLs for all impaired waters for which no TMDL had yet been developed. *Ohio Valley Env't Coalition, Inc. v. McCarthy*, 2017 WL 600102, at *19 (S.D. W. Va. Feb. 14, 2017).

The Fourth Circuit reversed. In its opinion, the Fourth Circuit emphasized WVDEP had made good faith efforts to comply with the Clean Water Act. *See Pruitt*, 893 F.3d at 231. For instance, WVDEP developed *some* TMDLs—just not ones for ionic toxicity. *See id.* In addition, WVDEP and EPA maintained a "Memorandum of Agreement" under which WVDEP promised to complete all TMDLs—including for ionic toxicity—by June 2026. *Id.*, at 228, 231.

Notably, the Fourth Circuit stressed "[c]ontinued intransigence" by WVDEP, *id.* at 231, could one day become a "constructive submission" of "no TMDLs," *see id.* Still—the Fourth Circuit encouraged WVDEP and EPA to make "good efforts" to implement the Memorandum of Agreement to ensure WVDEP meets the target completion dates. *Id.*

**B**

Six years later, Plaintiffs Sierra Club; West Virginia Highlands Conservancy, Inc.; and West Virginia Rivers Coalition, Inc. saw no progress by WVDEP to issue toxic ionicity TMDLs. Frustrated, they sued. Their Complaint centers on the Memorandum of Agreement.

Under the Memorandum of Agreement, WVDEP promised to establish ionic toxicity TMDLs for fifty-two impaired waterways in the Lower Guyandotte River Watershed by December 31, 2021. *See* Compl. ¶ 32. If WVDEP failed to meet this deadline, EPA promised to "convert" its prior *conditional approval* of "no TMDLs" to a *disapproval* of "no TMDLs." *Id.* ¶ 33.

WVDEP failed to provide ionic toxicity TMDLs by December 31st. *See id.* ¶ 36. Instead, on January 4, 2022, WVDEP submitted TMDLs for pollutants for the Lower Guyandotte River Watershed. *See id.* ¶ 37. None addressed ionic toxicity. *See id.* ¶ 38. WVDEP also announced it "suspended" TMDL development for the Lower Guyandotte River Watershed. *Id.*

On February 2, 2022, EPA approved WVDEP's submitted TMDLs for the Lower Guyandotte River Watershed. *See id.* ¶ 41. EPA "expressly recognized" WVDEP "neither approved nor disapproved a submission of 'no TMDLs' for ionic toxicity." *Id.* Yet, EPA did not approve or disapprove West Virginia's submission of no ionic toxicity TMDLs *or* issue its own ionic toxicity TMDLS. *See id.* ¶¶ 42–43.

Based on its interpretation of the Memorandum of Agreement, Plaintiffs allege three claims. *First*, they allege EPA failed to comply with the Memorandum of Agreement. *See id.* ¶¶ 45–49. As Plaintiffs see it, EPA promised to "automatically convert" its prior *conditional approval* of "no TMDLs" to a *disapproval* of "no TMDLs" if WVDEP failed to submit TMDLs by December 31, 2021. *See id.* ¶ 47. WVDEP failed to do so, but EPA did not act. *See id. Second*, Plaintiffs allege WVDEP made an actual submission of "no ionic toxicity TMDLs" to EPA when it "suspended" TMDL development for the Lower Guyandotte River Watershed. *Id.* ¶ 52. *Finally*, Plaintiffs allege WVDEP made a constructive submission of "no ionic toxicity TMDLs" to EPA. *See id.* ¶ 57. Either way, EPA should have developed ionic toxicity TMDLs for the Lower Guyandotte River Watershed. *See id.* ¶¶ 53, 59.

To date, neither WVDEP nor EPA has developed or promulgated ionic toxicity TMDLs for water in the Lower Guyandotte River Watershed. *See id.* ¶ 44.

### III

Eleven days after Plaintiffs filed suit, EPA announced it reached a potential settlement. *See Proposed Consent Decree, Clean Water Act Claim*, 89 Fed. Reg. 22,140 (Mar. 29, 2024). As a part of the settlement, EPA sought public input on a Proposed Consent Decree. *See id.*

Under the Proposed Consent Decree, EPA agrees to release "draft Ionic Toxicity TMDLs" for eleven waterbody segments in the Lower Guyandotte River Watershed by October 31, 2024. Coal Association Mem., Ex. 1 at 3 ¶ 1, ECF No. 18-1. After notice and comment, EPA agrees to issue "final Ionic Toxicity TMDLs" for the waterbody segments by January 15, 2025. *See id.*

The Proposed Consent Decree leaves room for WVDEP to act. If WVDEP submits its own ionic toxicity TMDLs for the eleven waterbody segments and EPA approves them, EPA does *not* have to issue a draft or final Ionic Toxicity TMDL for the same waters. *See id.* In addition, "nothing in th[e] Consent Decree . . . curtail[s] the discretion afforded EPA under the Clean Water Act or the Administrative Procedure Act." *Id.* at 4 ¶ 4.

EPA received forty-eight public comments. Both WVDEP and the West Virginia Coal Association submitted comments opposing the Proposed Consent Decree. Both argued "ionic toxicity" is not a pollutant under the Clean Water Act subject to TMDL regulation. *See* Comments of West Virginia Department of Environmental Protection 2, 4–5 (May 31, 2024) (EPA-HQ-OGC-2024-0145-0027) (arguing "ionic strength" by itself is not a "pollutant" "subject to a standalone TMDL"); Comments of West Virginia Coal Association 2 (May 23, 2024) (EPA-HQ-OGC-2024-0145-0021) (arguing "ionic toxicity" is not a "pollutant" under the Clean Water Act).

EPA has yet to address these comments. *See* EPA Opp'n at 2–3, ECF No. 23.

## IV

### A

WVDEP moved to intervene as a defendant to oppose Plaintiff's requests for declaratory and injunctive relief; assert affirmative defenses; and protect "its legal authority to prioritize, develop, and implement" TMDLs under the Clean Water Act. ECF No. 7 at 1. *See also* ECF No. 8 at 6 (stressing Plaintiffs and EPA kept the "primary regulator of water quality in West Virginia" in the dark throughout this litigation). It argues the Proposed Consent Decree asks this Court to find WVDEP was derelict in its duties under the Clean Water Act. *Id.* at 7.

As to affirmative defenses, WVDEP asserts the following: (1) failure to state a claim; (2) standing; (3) failure to follow the APA; (4) improper venue; (5) lack of jurisdiction; (6) waiver, laches, and estoppel; and (7) no attorneys' fees and/or costs. *See* ECF No. 9 at 7.

This Court granted WVDEP's request. *See* ECF No. 13.

### B

The West Virginia Coal Association also moved to intervene as a defendant to oppose Plaintiffs' request for declaratory and injunctive relief and to assert affirmative defenses. *See* Coal Association Mem at 1, ECF No. 17. It stresses Coal Mac, Inc. (one of its members) has a NPDES permit covering discharges in the Big Ugly Creek and Upper Mud River—two waterbodies subject to possible regulation under the Proposed Consent Decree. *See* Coal Association Mem. at 6, ECF No. 18. Coal Mac's permit expires in December 2025. *See id.*, Ex. 2, ECF No. 18-2.

As to affirmative defenses, the Coal Association asserts the following: (1) standing; (2) failure to submit appropriate comments under the APA; (3) laches; (4) lack of subject matter jurisdiction; and (5) failure of WVDEP and EPA to ensure the TMDLs at issue satisfy federal and state law. *See* Coal Association Answer ¶ 62, ECF No. 17.

The Coal Association also argues "ionic toxicity" is not a "pollutant" under the Clean Water Act subject to TMDL regulation. *See* Coal Association Reply at 2–3, 8, 11, ECF No. 25.

## LEGAL STANDARD & ANALYSIS

Federal Rule of Civil Procedure 24 provides two avenues for non-parties to timely intervene in an ongoing suit: intervention as a matter of right and permissive intervention. *See* Fed. R. Civ. P. 24. The Coal Association urges this Court to let it intervene under both avenues. *See* Coal Association Mem. at 4–13 (as of right); 13 (permissive). The Court declines the invitations.

### I

Rule 24(a)(2) allows intervention as of right when the movant claims an interest "relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest" unless the movant's interest is adequately represented by existing parties. Fed. R. Civ. P. 24(a)(2).

To intervene as of right, the Coal Association must show four things: (1) its motion is timely; (2) the Coal Association has an interest in the subject matter of the action; (3) disposition of the pending action may practically impair or impede the Coal Association's ability to protect that interest; and (3) the Coal Association's interest is not adequately represented by the existing parties. *See, e.g.*, *Newport News Shipbuilding & Drydock Co. v. Peninsula Shipbuilders' Ass'n*, 646 F.2d 117, 120 (4th Cir. 1981). *See also Alt v. EPA*, 758 F.3d 588, 561 (4th Cir. 1981) (discussing timelines). In short, in addition to timeliness, the Coal Association must show "interest, impairment of interest[,] and inadequate representation." *Gould v. Alleco, Inc.*, 883 F.2d 281, 284 (4th Cir. 1989). The Court considers each in turn.

**A**

The Court begins with timeliness. The Coal Association argues its motion is timely because the current litigation is in its "earliest stages." Coal Association Mem. at 5. The Court has not entered a scheduling order and the parties have yet to start discovery. *See id.*

No party contests this characterization. *See* WVDEP Resp. at 1, ECF No. 19; Pls.' Resp. at 4–13, ECF No. 21; EPA Resp. at 7–8.

Accordingly, the Court assumes—without deciding—the Coal Association's motion is timely. *See, e.g.*, *Steele v. Goodman*, 2019 WL 3366556, at *9 n.38 (E.D. Va. Jul. 25, 2019) ("[B]ecause the Court will deny the Motion to Intervene on other grounds, the Court assumes, without deciding, that the Motion to Intervene is timely.").

**B**

The Court turns to the second requirement: an interest in the litigation. An intervenor as of right must show it has "an interest relating to the property or transaction of the action." Fed. R. Civ. P. 24(a)(2). The Rule does not define "interest." In *Donaldson v. United States*, the Supreme Court held the term "obviously" means "a significantly protectable interest." 400 U.S. 517, 531 (1971) (holding taxpayer's interest in squashing subpoena requiring third party to disclose tax records mentioning him is "not enough" and "not of sufficient magnitude" to warrant intervention).

Despite this "obvious" meaning, what constitutes a "significantly protectable interest" remains as clear as mud. *See Security Ins. Co. Schipporeit, Inc.*, 69 F.3d 1337, 1380 (7th Cir. 1995) ("Whether an applicant has an interest sufficient to warrant intervention as a matter of right is a highly fact-specific determination, making comparison to other cases of limited value."); *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 969 (3d Cir. 1998) (reviewing precedents from circuits and

referring to the interest standard as "nebulous"); *Romero v. Bd. of Cty. Comm'rs*, 313 F.R.D. 133, 138 (D.N.M. 2016) (expressing difficulty in defining interest under Rule 24(a)(2)).

The Fourth Circuit requires intervenors to show they "stand to gain or lose by the direct legal operation of the district court's judgment" in the pending action. *Teague v. Bakker*, 931 F.2d 259, 261 (4th Cir. 1991). Ultimately, this inquiry looks to see if the intervenor "has a stake in the matter that goes beyond a generalized preference that the case come out a certain way." *DeOtte v. Nevada*, 20 F.4th 1055, 1068 (5th Cir. 2021). That is, the intervenor must have more than "ideological, economic, or precedential reasons" for intervention. *Id.*

## 1

The Coal Association argues it has an interest in the pending action because "the imposition of effluent limits" from an ionic toxicity TMDL, Coal Association Mem. at 6, *might* reduce its members' property values, *see id.* at 7–8, and *might* require members to "invest in extremely expensive treatment technology for a yet to be defined effluent parameter(s)," *id.* at 8. For support, the Coal Association points to Coal Mac LLC—one of its members. Coal Mac has a state-issued NPDES permit covering two streams subject to regulation under the Proposed Consent Decree. *See id.* at 6. The permit expires in December 2025. *See id.*, Ex. 2 at 1.

The Court finds this "interest"—if it exists—is insufficient to justify intervention as of right. To start, the Coal Association pours old wine into new wine skins. Nine years ago, the Coal Association made the *same* argument to justify intervention. *See Ohio Valley Env't Coal., Inc. v. Pruitt*, Civ. No. 3:14-cv-271, ECF No. 21 at 2 (S.D. W. Va. filed May 27, 2015) (arguing "the development of TMDLs will diminish the value of coal reserves and property held by WVCA members"). In an opinion spanning twenty-two pages of the Federal Supplement, this Court rejected its argument. *See McCarthy*, 313 F.R.D. at 20–21. It does so again here.

-11-

To help those "equipped only with dim lanterns," the Court repeats itself. *Ohio Valley Env't Coal., Inc. v. ERP Env't Fund, Inc.*, 2019 WL 3884021, at *2 (S.D. W. Va. Aug. 15, 2019).

> [A]ssume Plaintiffs get the relief they seek—a [consent decree] requiring EPA to develop TMDLs for ionic toxicity for certain West Virginia streams. In that event, the [consent decree] only mandate[s] that EPA begin the administrative process of promulgating TMDLs for conductivity. After EPA promulgates TMDLs, WVDEP would then be tasked with deciding whether the TMDLs necessitate effluent limits on affected streams in West Virginia. On one hand, it is possible that TMDLs crafted by EPA will require effluent limits, but at this stage, it is just as possible that TMDLs would not necessitate any effluent limits. If effluent limits are required, WVDEP would undergo the administrative process of deciding how to revise existing permits, if that is necessary at all, and how to impose new effluent limits on new permit applications. In deciding how to impose effluent limits for each stream, WVDEP will decide how to spread effluent limits across multiple point sources discharging into the same water body. Thus, at a glance, this Court cannot even begin to speculate on several matters that are pertinent to whether this Court's ruling will have any effect at all down the road on WVCA members' permits, much less their property values and treatment obligations. These unanswered questions are wholly outside the scope of this litigation, making WVCA's interests well outside the scope as well. Because WVCA members' predicted permit changes will occur, if at all, not until after multiple interim steps have been taken by federal and state administrative agencies, [the proposed consent decree] would not necessarily affect WVCA members' NPDES permits, much less their property values, coal worth, or treatment obligations. Thus, WVCA members will not gain or lose directly by the disposition of this case.

*McCarthy*, 313 F.R.D. at 20–21 (citing *Teague*, 931 F.2d at 261).

Nothing has changed. No doubt—the Proposed Consent Decree requires EPA to finalize ionic toxicity TMDLs for the Lower Guyandotte River Watershed. *See* Coal Association Mem., Ex. 2 ¶ 1. Indeed, EPA promises quick action—*draft* TMDLs by October 2024 and *final* TMDLs by January 2025. *See id.* Yet, the Proposed Consent Decree does nothing more than set a deadline for rulemaking. *See id.* ¶¶ 1–2 (allowing parties to extend the proposed rulemaking deadlines).

Moreover, the Proposed Consent Decree comes with caveats. *First*, WVDEP can submit ionic toxicity TMDLs to EPA at any time before January 15, 2025. *See id.* ¶ 1. If EPA approves these TMDLs, it need not issue draft or final TMDLs for the same waters. *See id.* In essence,

WVDEP—a party to the pending action—controls whether the Proposed Consent Decree becomes a nullity. It is far from clear whether WVDEP will exercise this control.

*Second*, the Proposed Consent Decree does not "curtail the discretion afforded EPA under the Clean Water Act or the Administrative Procedure Act." *Id.* at 4 ¶ 4. This language strips the Court—and the parties—from placing limits on the substantive content of any TMDL created by WVDEP or EPA. In fact, EPA must conduct notice-and-comment rulemaking—a process WVDEP, the Coal Association, *and* Coal Mac LLC can participate in. After receiving public feedback, EPA retains "discretion" to *not* issue any *final* ionic toxicity TMDL whatsoever. *See In re Idaho Conservation League*, 811 F.3d 502, 514 (D.C. Cir. 2016) (interpreting similar language in a joint motion on consent). All told, stricter TMDL regulations are anything but a "foregone conclusion." Coal Association Reply at 9. *See also McCarthy*, 313 F.R.D. at 20 ("[W]hether permit revisions are required at all is a decision that will be made at the discretion of federal and state agencies after several steps of administrative processes subject to public comment or review.").

Even assuming EPA promulgates ionic toxicity TMDLs, any impact on Coal Mac is still uncertain. WVDEP must—for itself—decide whether any of the ionic toxicity TMDLs necessitate effluent limits on waterways in the Lower Guyandotte River Watershed. *See* 33 U.S.C. § 1313(d)(2) ("If the Administrator disapproves [state submitted TMDLs], [the administrator] shall . . . establish such loads for such waters . . . and upon such . . . establishment the State shall incorporate them into its current plan); *id.* § 1313(e) (explaining plans for navigable waters must include effluent limitations). WVDEP may decide *no* effluent limitations or other restrictions on existing or new permit holders are warranted. Or it may decide some restrictions are warranted. Either way, WVDEP must undertake an administrative process to inform its decision making—a

process the Coal Association and Coal Mac can participate in. *See* W. Va. Code § 22-11-6 *et seq.* (requiring public input before modifying or issuing a NPDES permit).

All told, the Coal Association fails to show how the Proposed Consent Decree will ultimately dictate how WVDEP chooses to implement any TMDLs recommended by EPA. Given these uncertain contingencies, the Court says what it said nine years ago: the Court cannot "begin to speculate" whether the Decree "will have *any effect at all* down the road on WVCA members' permits, much less their property values and treatment obligations." *McCarthy*, 313 F.R.D. at 20.

**2**

Caselaw supports this conclusion. Contingent interests rarely support intervention as of right. *See, e.g.*, *Benjamin v. Dep't of Pub. Welfare*, 701 F.3d 938, 951 (3d Cir. 2012) (stating the "polestar" for intervention as of right is whether the intervenor's interest is direct or remote). Nor do purely economic interests. *See, e.g.*, *Greene v. United States*, 996 F.2d 973, 976 (9th Cir. 1993).

In *United States v. Metropolitan St. Louis Sewer District*, the United States and the State of Missouri sued the Metropolitan St. Louis Sewer to force the sewer district to come into "permanent and consistent compliance" with the Clean Water Act. 569 F.3d 829, 832 (8th Cir. 2009). The Missouri Industrial Energy Consumers—an association of businesses who discharge into the district's wastewater system—moved to intervene as a "neutral party" to participate in settlement negotiations. *Id.* at 833. It argued any relief won by the United States and the State of Missouri would ultimately translate to higher paid user fees to its members. *See id.* at 835.

The District Court denied the motion. It outlined a series of events that could occur, but nevertheless were too speculative to warrant intervention. *See id.* at 834 (discussing district court findings). The Eighth Circuit affirmed. It found the "possibility of increased sewer rates is not an imminent injury." *Id.* at 835. Instead, the possible harm relied on a series of conjectural and

hypothetical strands of thought; for example, the sewer district's charter imposed procedural hurdles to stymy any effort to increase rates. *See id.* More importantly, the Eighth Circuit stressed "any judgment or consent decree" issued in the case would only "establish[] what [the sewer district] must do to comply" with the Clean Water Act. *Id.* at 836. It would not "specify how the [sewer district] will pay for the needed measures." *Id.* (stating the plaintiffs' requested relief does not "seek to compel the [district] to fund its compliance in any particular way").

In *Manasota-88, Inc. v. Tidwell*, a plaintiff sued EPA to "identify noncompliance water bodies and assign TMDLs to those water bodies" after Florida refused to do so. 896 F.2d 1318, 1322 (11th Cir. 1990) ("[P]laintiff seeks to compel the EPA to promulgate its own standards fill the gap left by the State's inaction."). Florida Electric Power Coordinating Group ("FCG")—a non-profit of thirty-eight electric power generation facilities that discharge treated waste waters into Florida's surface waters—moved to intervene. *See id.* at 1320. They argued their operation permits "require[d] compliance" with Florida's water quality standards. Any new standards, therefore, "could" cause members to "restrict present and future discharged of treatment waster waters" and "inevitably" expose members to "increases in capital and operating costs." *Id.* at 1322.

The Eleventh Circuit denied their request to intervene for two reasons. *First*, FCG failed to specify a noncompliant water body one of its members discharged into. *See id.* (stating FCG offers nothing but a "matter of speculation"). *Second*—and more importantly—FCG's fear of increased compliance costs was nothing more than a "generalized grievance." *Id.*

In *Sierra Club v. U.S. E.P.A.*, the Sierra Club sued EPA to issue revised ozone National Ambient Air Quality Standards (NAAQS). *See* 2013 WL 5568253, at *1 (N.D. Cal. Oct. 9, 2013). The National Association of Manufacturers and other industry groups moved to intervene. *See id.* at *1–*2. They argued more stringent ozone NAAQSs would "result in additional requirements on

those industries." *Id.* at *2. The intervenors previously participated in past rulemakings concerning ozone regulations. *See id.* The District Court rejected the motion. The Court explained the "instant lawsuit d[id] not seek an order adopting particular ozone qualities, but only one that EPA's review of the ozone quality standards be completed by a fixed date." *Id.* at *3. As a result, the economic interests expressed by the intervenors remained "too remote and contingent on other events" to justify intervention." *Id.* (citing *Tidwell* approvingly). *See also Am. Lung Ass'n v. Reilly*, 962 F.2d 258, 261 (2d Cir. 1992) (reaching same conclusion in similar case).

In *Our Children's Earth Foundation v. U.S. E.P.A.*, plaintiffs sued EPA to review emissions standards for petroleum refineries. *See* 2006 WL 1305223, at *1 (N.D. Cal. May 11, 2006). The American Petroleum Institute and the National Petrochemical & Refiners Association moved to intervene. *See id.* They argued a "change in the regulations might affect the operations of both associations' members." *Id.* The District Court denied the motion. The pending action did not "concern property;" it concerned a process: "the agency review of regulations." *Id.* at *2. The lawsuit sought to determine whether EPA needed to issue revised standards and, if so, when those changes would take place. *See id.* at *3. It did not seek to determine whether the rules *would* change, "much less what any changes might be." *Id.* As a result, any financial interests asserted by the refineries did not "relate[] directly" to the transaction at the heart of the litigation. *Id.*

The Court could go on. *See Mo. Coal. for Env't Found. v. Wheeler*, 2020 WL 2331201, at *5–*6 (W.D. Mo. May 11, 2020) (rejecting motion to intervene by industry association in a suit to compel EPA to issue water quality standards because associations' incorrectly assumed the promulgation of a water quality standard necessarily meant increased compliance costs); *Mo. Coal. for Env't Found. v. McCarthy*, 2016 WL 3566253, at *4 (W.D. Mo. June 27, 2016) (rejecting same association's argument that a lawsuit seeking an "injunction directing the EPA's promulgation of

revised or new lake numeric nutrient and chlorophyll water quality criteria that meet the requirements of the CWA within 90 days of the date of the order" would result in a imminent injury because the alleged threatened economic consequences would only occur after a series of contingent events that were too speculative to lead to an imminent injury); *Ctr. for Biological Diversity v. U.S. E.P.A.*, 2014 WL 636829, at *5 (W.D. Wash. Feb. 18, 2014) (denying intervention as of right to trade association representing members of oil and natural gas industry in a suit seeking to compel the EPA to disapprove Washington's list of impaired waters because "[r]evision of member's permits, which will be determined not by this lawsuit but at the discretion of state and federal administrative agencies and via intervening regulatory processes, is too remote to merit intervention as of right"); *Defs. of Wildlife v. Jackson*, 284 F.R.D. 1, 7 (D.D.C. 2012) (denying motion to intervene because intervenor could not show the consent decree's suggested timetable was "inadequate"); *McCarthy*, 313 F.R.D. at 18–26 (citing more examples).

All these cases swim in the same pond. They teach that an intervenor cannot rely on "multiple layers of contingency" to show a significantly protectable interest. *Id.* at 25. Applying this lesson here means the Coal Association cannot intervene. The Proposed Consent Decree does not dictate any specific ionic toxicity TMDL. It creates only a (flexible) timeline for the rulemaking process. Allowing the Coal Association to halt the proposed rule-making schedule because it *might* result in a *potential*, adverse decision from either EPA or the WVDEP would "open the flood gates" to incessant intermeddling in settlement efforts. *See id.* at n.11. Rule 24(a)(2) requires more.

**2**

The Coal Associations disagrees. It argues Coal Mac has standing to challenge TMDLs. *See* Coal Association Mem. at 9–10. It cites *City of Kennett, Missouri v. EPA*, 887 F.3d 424 (8th

Cir. 2018); *American Farm Bureau Federation v. EPA*, 792 F.3d 281 (3d Cir. 2015); and *Natural Resources Defense Counsel v. Costle*, 561 F.2d 904 (D.C. Cir. 1977) for support.

This argument sinks under the slightest pressure. Consider first *City of Kennett*. There, EPA issued an updated TMDL wasteload allocation for pollutants from a Missouri city's wastewater treatment plant. *See* 887 F.3d at 429. The new TMDL set "more stringent" wasteload allocations than existing restrictions. *See id.* For example, the current restrictions allowed "65 mg/L of biochemical oxygen demand and 110 mg/L of total suspended solids." *Id.* The new TMDL set limits of 5 mg/L and 31 mg/L respectively. *See id.* The City sued. It pointed to its NPDES permit that was set to expire in thirteen months. *See id.* at 431. Because any new permit "must contain [the] more stringent limits on discharge," the City argued the new TMDL would require expensive adjustments. *See id.* The Eighth Circuit held the City had standing to challenge the TMDL. By the time the City sued, EPA issued its revised, stricter TMDL. Because the TMDL's wasteload allocations are "binding on future permits" unless EPA decides otherwise, the Eighth Circuit found, the City's fears of costly adjustments was not "conjectural." *Id.* (quotation omitted).

Similarly, in *American Farm Bureau Federation v. EPA*, plaintiff trade associations challenged the EPA's promulgation of a TMDL. *See* 792 F.3d at 293. The Third Circuit held the trade associations had standing to challenge the TMDL because the issued TMDL meant future and existing permits would be revised to match it. *See id.* ("[E]ven if the TMDL cause injury itself by itself, it will give way to requirements with which the Farm Bureau will have to comply.").

*City of Kennett* and *American Farm* dealt with promulgated TMDLs—not unissued TMDLs still subject to public comment and agency review. Both reach the same conclusion: when an NPDES permit holder determines a newly issued TMDL will force it to spend money to adapt, they can sue the EPA to challenge the TMDL before the State requires revisions to its permit.

*Kennett*, 887 F.3d at 431; *Am. Farm Bur. Fed.*, 792 F.3d at 293. This comports with precedent. *See Ass'n of Data Processing Serv. Organizations, Inc. v. Camp*, 397 U.S. 150, 152 (1970) (allowing data processors to sue when issued agency adjudication ruling expanded number of institutions authorized to perform data process would increase competition in the field); *Barlow v. Collins*, 397 U.S. 159, 164 (1970) (allowing tenant-farmers to challenge newly promulgated regulation gave incentives to landlords to charge higher rents).

This lesson does not speak to this case. In fact, caselaw suggests permits holders like Coal Mac cannot automatically challenge "as-yet-unpromulgated TMDL[s]." *City of Dover v. EPA*, 36 F. Supp. 3d 103, 114 (D.D.C. 2014) (stating unpromulgated TMDLs only "indirectly" affect NPDES permitholders). *See also Kenneth*, 887 F.3d at 431 (citing *Dover* approvingly); *Wheeler*, 2020 WL 2331201 at *8 (distinguishing *Kenneth* and *American Farm Bureau* on similar grounds).

*National Resources Defense Council v. Costle* fares no better. There, environmental plaintiffs reached a settlement agreement with EPA. *See id.* at 904. The proposed settlement required EPA to initiate rulemaking for certain named pollutants pursuant to an agreed-upon schedule. *See id.* at 906. Critically, the settlement curbed EPA's discretion. EPA could decide *not* to issue a regulation for a pollutant *only if* it met certain requirements in the settlement agreement and "promptly submit[ed] a statement under oath" to the plaintiffs explaining its decision. *Id.* If plaintiffs disagreed with EPA, they could challenge its decision. *See id.*

Relying on this distinction, the D.C. Circuit has twice refused to apply *Costle* when an intervenor challenges a settlement agreement or proposed consent decree establishing a rulemaking schedule. *See Defs. of Wildlife v. Perciasepe*, 714 F.3d 1317, 1326 (D.C. Cir. 2013) (rejecting motion to intervene when the proposed consent does not "in any way" dictate the content of the regulations); *In re Idaho Conservation League*, 811 F.3d at 513 (finding *Perciasepe*—not

-19-

*Costle*—"controlling" to dismiss a motion to intervene challenging a joint order on consent setting nothing but a rulemaking schedule). The D.C. Circuit's move away from *Costle* counsels against applying it here. *Cf. Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2271–72 (2024) (warning lower courts against relying on a precedent an appellate court refuses to apply for years); *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 535 n.4 (2022) (similar).

Here—unlike *Costle*—the Proposed Consent Decree does not limit EPA's discretion under the Clean Water Act. EPA remains free to solicit and weigh public comments in its decision-making process. It can ultimately decide not to issue an ionic toxicity TMDL for a particular body of water. *Compare Alternative Res. & Dev. Found. v. Veneman*, 262 F.3d 406, 411 (D.C. Cir. 2001) ("Significantly, the stipulated dismissal does no more than what the agency could have done by granting Alternative Research's pending agency petition for rulemaking, and the stipulated dismissal does not bind the agency in its rulemaking.").

The Coal Association makes one last pitch. It suggests EPA worked for the "last three years" to target the coal industry. Coal Association Reply at 3. It cites two reports for support. *See id.* at 3–4. The first report explains EPA and WVDEP intend to jointly develop ionic toxicity modeling tools for the Lower Guyandotte Watershed. *See id.*, Ex. 1 at 2, 4, ECF No. 25-1 (allowing WVDEP and EPA to "review and comment" on the project throughout its development). The report presupposes future TMDLs for the area, *see id.* at 6, and references "point sources []" including mining" as an area of potential assessment, *id.* at 3. The second report provides "recommendations" for "ion reduction treatment technologies" in the Lower Guyandotte River Watershed. *Id.*, Ex. 2 at 4, ECF No. 25-2 (noting these recommendations are "starting point[s]"). The report targets specific "NPDES permitted mining outlets." *Id.*

-20-

The Coal Association sees these reports as evidence of ill-will towards the coal industry. The Court is not so convinced. Neither report suggests EPA intends to use the pilot program or modelling systems—let alone the Proposed Consent Decree—to circumscribe WVDEP's authority to implement its own permit restrictions (if any) in the Lower Guyandotte River Watershed. In fact, the reports reiterate again and again their tentative nature. At best, the reports suggest WVDEP knew of its obligation to set ionic toxicity TMDLs and chose to forego meaningful cooperation with EPA to create them—despite the Fourth Circuit's admonition to collaborate to "meet[] the target completion dates." *Pruitt*, 893 F.3d at 231. *See also* Compl. ¶¶ 36–44 (detailing WVDEP reluctance to submit ionic toxicity TMDLs).

\* \* \*

The Coal Association wants to intervene based on a "speculative future interest." *In re Sierra Club*, 945 F.2d 776, 779 (4th Cir. 1991) (warning against allowing intervenors to become mere lobbyists). It asks this Court to make "inferential steps, tie them together with inferential string, and come up with injury or impairment." *Env't Defense v. Leavitt*, 329 F. Supp. 2d 55, 69 (D.D.C. 2004). Yes, it is possible EPA will "rush through its work" and issue a TMDL that harms Coal Mac's NPDES permit. *Id.* But at this point this possibility is "pure speculation." *Id.*

Accordingly, the Court finds the Coal Associations lacks a significantly protectable interest in the pending litigation warranting intervention as of right.

## C

The Court turns to the third requirement: impairment. *If* the intervenor has an interest in the pending litigation, it must next show "disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest." Fed. R. Civ. P. 24(a)(2). There is no one way to show impairment. In the Fourth Circuit, impairment is met where: (1) disposition of the

pending action would put the intervenor at a "practical disadvantage" in protecting its interest or (2) the stare decisis effect of judgment would legally preclude the intervenor from protecting its interest. *See Francis v. Chamber of Commerce of U.S.*, 481 F.2d 192, 195 n.8 (4th Cir. 1973).

Despite its flexibility, the impairment prong has limits. Impairment is not satisfied just because filing a separate suit and duplicating efforts might be difficult or tedious. *See id.* at 196. Nor is it satisfied when the intervenor could protect its interest by participating in the pending litigation as an *amicus curiae*. *See McHenry v. Comm'r*, 677 F.3d 214, 227 (4th Cir. 2012); *McCarthy*, 313 F.R.D. at 26 n. 12 (collecting cases).[1]

The Coal Association presents two arguments. Neither carries water. *First*, the Coal Association states the "outcome of the regulatory process" is a "foregone conclusion." Coal Association Mem. at 8. Not so. The Proposed Consent Decree does not dictate any substantive outcome. Nor does it not limit public participation in rulemaking process. *See supra* Part I.B.

To be sure, the Proposed Consent Decree says EPA "shall" release draft ionic toxicity TMDLs in October 2024 and "shall" establish ionic toxicity TMDLs by January 2025. Coal Association Mem., Ex. 1 at 3 ¶ 3. "Shall" typically means must, not should. *See Kingdomware Technologies, Inc. v. United States*, 579 U.S. 162, 171–72 (2016). But not always. *See Guiterrez de Martinez v. Lamango*, 515 U.S. 417, 432–33 n.9 (1995) ("Though 'shall' generally means 'must,' legal writers sometimes use 'shall' to mean 'should,' 'will,' or even 'may.'"). Sometimes "shall" allows room for discretion. *See TVA v. Hill*, 437 U.S. 153, 211–12 (1978).

Here, context confirms "shall" carries discretion. *First*, WVDEP may—at any time before January 15, 2025—issue its own ionic toxicity TMDLs. If it does, EPA does not need to finalize

---

[1] Sometimes the "practical disadvantage or impediment" from non-intervention would *not* be "significantly relieved by allowing the [proposed intervenors] to participate as *amicus* in the district court proceedings." *Newport News Shipbuilding & Drydock Co.*, 646 F.2d at 121. *See also Feller v. Brock*, 802 F.2d 722, 729–30 (4th Cir. 1986) (similar). The Coal Association does not press this argument. Accordingly, the Court does not address it.

its own ionic toxicity TMDLs. *See* Coal Association Mem., Ex. 1 at 3 ¶ 3. *Second*, the Proposed Consent Decree recognizes "[c]ircumstances may arise that warrant modifying this Consent Decree"—including the promulgation deadlines. *Id.* ¶ 2. If Plaintiffs and EPA agree, they may extend the promulgation deadlines by written agreement or by motion to this Court. *See id.* at 2–3 ¶ 2. *Finally*, "nothing" in the Proposed Consent Decree "curtail[s] the discretion afforded EPA under the Clean Water Act or the Administrative Procedure Act." *Id.* at 3 ¶ 4. Collectively, these qualifications suggest final administrative action by January 2025 is possible, but not certain.

Second, the Coal Associations stresses it might not have a judicial forum downstream. Coal Association Mem. at 10. It cites *Monongahela Power Co. v. Chief Office of Water Resources, Division of Environmental Protection*, 567 S.E.2d 629 (W. Va. 2002), for support.

The Court disagrees. In *Monongahela*, the West Virginia Supreme Court of Appeals held state courts cannot hear challenges to promulgated TMDLs. *See id.* at 630–31. It did not preclude challenges in *federal* court. In fact, the Court stressed federal courts routinely hear challenges against TMDLs. *See id.* at 639 & n.18 (citing cases). The Coal Association knows this. It cites *American Farm Bureau* and *City of Kennett, Missouri* in its briefing approvingly. *See, e.g.*, *id.* at 9 n.3. Both cases dealt with challenges by NPDES permitholders *after* EPA issued a TMDL. *See supra* Part I.B.2 (discussing both cases). The Coal Association fails to show why it wouldn't be able to bring a similar challenge here. *See* Coal Association Reply at 9 n.3 (arguing it *could*).

Moreover, the Coal Association's members can participate in several proceedings to challenge the TMDLs. They participate in EPA's public rulemaking process. *See* 40 C.F.R. § 130.7(d)(2) (requiring EPA to solicit public comments before issuing a TMDL). If this fails, they can sue EPA under the Administrative Procedure Act after the TMDL is promulgated. *See McCarthy*, 313 F.R.D. at 27. If this fails, they can participate in WVDEP's process of translating

-23-

EPA's TMDL into permit-specific effluent limits. *See* W. Va. Code R. § 47-30-10 ("All draft permits shall be . . . public noticed and available for public comment). If this fails, they can appeal the WVDEP's decision to the West Virginia Environmental Water Quality Board. *See* W. Va. Code R. § 47-30-3. All told, the Coal Association's members can "better protect their interests at each of these later steps than they could in this litigation" which (again) does not involve the substantive content of the ionic toxicity TMDLs. *McCarthy*, 313 F.R.D. at 27.

* * *

The Coal Association fails to show impairment. Any interest it has in avoiding additional restrictions in their NPDES permits is not impaired by the Proposed Consent Decree because it does not establish any substantive TMDLs or effluent limits. Future administrative processes and judicial acts are possible. Furthermore, to the extent the Coal Association's absence would impose any conceivable practical disadvantage, this impairment is "significantly alleviated" by allowing the Coal Association to participate as *amicus curiae*. *McCarthy*, 313 F.R.D. at 28.

**D**

The Court turns to the last hurdle: inadequate representation. If an intervenor can show an interest and impairment, it must *also* show the "existing parties [cannot] adequately represent" its interest. Fed. R. Civ. P. 24(a)(2). The Coal Association cannot make this showing.

Inadequate representation is usually easy to show. *See Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972) (explaining Rule 24(a)(2) is "satisfied if the applicant shows that the representation for his interest 'may be' inadequate" and that this burden is "minimal").

But when an intervenor shares the same "ultimate objective" as a government party, the intervenor "must mount strong showing of inadequacy." *Stuart v. Huff*, 706 F.3d 345, 352 (4th Cir. 2013). The intervenor must show "adversity of interest, collusion, or nonfeasance." *United*

-24-

*States v. New-Indy Catawba, LLC*, 2022 WL 18357257, at *11 (D.S.C. Sept. 15, 2022) (citing *id.* at 347, 349). Disagreement over litigation tactics is "not enough." *Stuart*, 706 F.3d at 353.

WVDEP is a party to this suit. In its enabling legislation, the West Virginia State Legislature charged WVDEP with "improv[ing] the quality of the environment . . . in a manner consistent with the benefits to be derived from strong . . . energy-producing industries." W. Va. Code. § 22-1-1(b)(4). In addition, the West Virginia Pollution Control Act requires WVDEP to "maintain reasonable standards of purity and quality of the water of the state consistent with . . . healthy industrial development." W. Va. Code § 22-11-2(a)(3). Collectively, these legislative directives require WVDEP to consider the interests of regulated entities—like the coal industry—in its decision-making process. This legislative obligation weighs against finding inadequate representation. *See Matter of Richman*, 104 F.3d 654, 659 (4th Cir. 1997) ("[T]he burden of demonstrating inadequate representation . . . 'is at its most onerous' where an existing party is under a legal obligation to represent the would-be intervenor's interest.").

Moreover, WVDEP and the Coal Association share the "same ultimate objective." *Stuart*, 706 F.3d at 352. Both entities want to stop the Proposed Consent Decree from going into effect. *See* WVDEP Mem. at 4; Coal Association Mem. at 3–4. In fact, WVDEP and the Coal Association want to assert the same affirmative defenses. They both challenge standing. They both challenge venue. They both challenge jurisdiction. They both invoke the doctrine of *laches*. They both cite the APA. *Compare* ECF No. 9 at 7 (WVDEP) *with* ECF No. 17-1 at 62 (Coal Association).[2]

---

[2] At first glance, the Proposed Consent Decree does not meaningfully differ from other consent decrees requiring the government signatory to promulgate or modify regulations or other administrative issuances by a certain date. *See, e.g.*, *Conservation Law Found. of New England, Inc. v. Franklin*, 989 F.2d 54, 58, 61 (1st Cir. 1993) (affirming consent decree requiring the Secretary of Commerce to create and implement a groundfish rebuilding plan if the regional fishery management council failed to do so); *Berger v. Heckler*, 771 F.2d 1556, 1579–80 (2d Cir. 1985) (enforcing consent decree requiring the Secretary of Health & Human Services to "promulgate regulations which are in accordance with the decree"); *Ferrell v. Pierce*, 743 F.2d 454, 465–66 (7th Cir. 1984) (affirming consent decree requiring the Department of Housing & Urban Development to adopt a particularly mortgage foreclosure program); *Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1121 (D.C. Cir. 1983) (affirming consent decree requiring EPA

The Coal Association ignores all this. It stresses—repeatedly—it is the *only* party arguing ionic toxicity is not a "pollutant" subject to regulations (let alone a TMDL) under the Clean Water Act. *See, e.g.*, Coal Association Reply at 11. WVDEP does not share this "broader objective." *Id.*

The Court disagrees. Admittedly, WVDEP did not raise the "ionic toxicity is not a pollutant" argument in its intervention briefing. *See generally* WVDEP Mem. But it *did* raise the issue to EPA during the public comment period on the Proposed Consent Decree. *See* Comments of West Virginia Department of Environmental Protection 2, 4–5 (May 31, 2024) (EPA-HQ-OGC-2024-0145-0027) (arguing "ionic strength" by itself is not a "pollutant" "subject to a standalone TMDL"). The Coal Association fails to show why WVDEP could not raise similar arguments now.

In short, the Court finds the Coal Association cannot overcome the presumption of adequate representation afforded to WVDEP. Both entities want the same thing—a decision from this Court rejecting the Proposed Consent Decree. *See McCarthy*, 313 F.R.D. at 28–30.

\* \* \*

The Coal Associations fails to show it has an interest in the pending litigation. It fails to show how this litigation will impair or impede any assumed interest. And it fails to show inadequate representation by the existing parties. As a result, the Coal Association does not have a right to intervene in this action under Fed. R. Civ. P. 24(a)(2).

Accordingly, the Court **DENIES** the Coal Association's Motion to Intervene as of Right under Fed. R. Civ. P. 24(a)(2).

---

to "promulgate guidelines and limitations" governing the discharge by twenty-one industries of sixty-five specified pollutants); *Wildearth Guardians v. Jackson*, 2011 WL 4485964, at *5, *12 (D. Colo. Sept. 27, 2011) (approving consent decree setting schedule by which EPA must either approve improvement plans governing regional haze submitted by various states or issue its own federal improvement plan). Of course, the existing parties—including WVDEP—remain free to challenge the Proposed Consent Decree. The Court remains open to persuasion.

**II**

The Coal Association also seeks to intervene under Fed. R. Civ. P. 24(b)(1)(B). Under Rule 24(b)(1)(B), the Court *may* "permit anyone to intervene who has a claim or defense that shares with the main action a common question of law or fact."

Decisions under Rule 24(b)(1)(B) "lie[] within the sound discretion of the trial court." *Smith v. Pennington*, 352 F.3d 884, 892 (4th Cir. 2003) (quotation omitted). In exercising this discretion, the District Court must consider whether intervention will "unduly delay" or "prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).

The Court declines to allow permissive intervention in this case for three reasons. *First*, the Coal Associations brings nothing new to the table. Its Answer and Affirmative Defenses largely repeat the claims brought by WVDEP. *See supra* Part I.D. The Court expects WVDEP will "zealously pursu[e]" its defenses. *Am. Coll. of Obstetricians & Gynecologists v. United States*, 467 F. Supp. 3d 282, 292 (D. Md. 2020) (relying on similar argument to reject permissive intervention); *Makhteshim Agan of N. Am., Inc. v. Nat'l Marine Fisheries Serv.*, 2018 WL 5846816, at *6 (D. Md. Nov. 8, 2018) (explaining "the opportunities for [a] would-be intervenor to make meaningful contributions to [a pending] case are likely to be limited" when intervention as of right is denied based on the government's adequate representation). Allowing the Coal Association to present nearly identical arguments wil only result in "duplicative briefing." *McCarthy*, 313 F.R.D. at 31 (quoting *Ctr. for Biological Diversity*, 2014 WL 636829 at *9).

*Second*, the Coal Association wants to disrupt settlement proceedings. Although intervention at this stage is not unheard of, it is rare. After all, "[o]fficious intermeddlers ought not be allowed to hijack litigation that the real parties in interest can resolve to mutual benefit." *Sierra Club v. EPA*, 358 F.3d 516, 518 (7th Cir. 2004) (Easterbrook, J.) (denying motion to intervene by

state chamber of commerce aiming to "nix a settlement"). *See also Seneca Res. Corp. v. Twp. of Highland, Elk Cnty., Penn.*, 863 F.3d 245, 253 n.8 (3d Cir. 2017) ("We have repeatedly stated that a party is entitled to settle its lawsuit without inviting intervenors where settlement is the only reasonable course of action."); *Floyd v. City of New York*, 770 F.3d 1051, 1060 (2d Cir. 2014) (rejecting motion to intervene because intervention would frustrate the parties' desire to promptly implement agreed reforms); *R&G Mortg. v. Fed. Home Loan Mortg. Corp.*, 584 F.3d 1, 7 (1st Cir. 2009) ("[M]options to intervene that will have the effect of reopening settled cases are regarded with particular skepticism because such motions tend to prejudice the rights of settling parties.").

 *Finally*, to the extent the Coal Association wants to provide information to this Court addressing the ability of EPA to issue ionic toxicity TMDLs, they are encouraged to request permission to file an *amicus* brief. *See McHenry*, 677 F.3d at 227 ("Numerous courts support the proposition that allowing proposed intervenor[s] to file an amicus brief is an adequate alternative to permissive intervention."). The Coal Association took a similar path nine years ago. *See McCarthy*, 313 F.R.D. at 31–31.

 Accordingly, the Court **DENIES** the Coal Association's Motion to Intervene as a Defendant under Fed. R. Civ. P. 24(b)(2)(B).

## CONCLUSION

 The Court **DENIES** West Virginia Coal Association's Motion to Intervene as a Defendant in this matter. The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

     ENTER:  August 1, 2024

     ROBERT C. CHAMBERS
     UNITED STATES DISTRICT JUDGE